UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

LISA ANN DOGUA                          CIVIL ACTION NO. 6:21-cv-00138

VERSUS                                  JUDGE JUNEAU

COMMISSIONER OF THE SOCIAL              MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, and for the reasons set forth below, it is recommended that the Commissioner's decision should be affirmed.

## Administrative Proceedings

The claimant, Lisa Dogua, fully exhausted her administrative remedies before initiating this action. She filed an application for disability insurance benefits, alleging disability beginning on March 3, 2014.[1] Her application was denied.[2] She then requested a hearing, which was held on July 13, 2020 before Administrative Law Judge Luke Liter.[3] At the hearing, the alleged disability onset date was

---

[1]    Rec. Doc. 11-1 at 190.

[2]    Rec. Doc. 11-1 at 53.

[3]    A transcript of the hearing is found in the record at Rec. Doc. 11-1 at 32-47.

amended to May 15, 2018.[4]  The ALJ issued a decision on August 10, 2020, concluding that Ms. Dogua was not disabled within the meaning of the Social Security Act from her amended disability onset date through December 31, 2018, the date she was last insured.[5]  Ms. Dogua asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[6]  Therefore, the ALJ's decision became the Commissioner's final decision.[7]  Ms. Dogua now seeks judicial review of the Commissioner's decision.

## **Summary of Pertinent Facts**

Ms. Dogua was born on April 18, 1965,[8] and she was fifty-five years old at the time of the ALJ's decision.  She obtained a GED in 1983, and previously worked as a cook.[9]  She alleged that she has been disabled since May 15, 2018, due to diabetes, heart attack, nerve damage, back problems, cholesterol, and neuropathy.[10]

Ms. Dogua had a myocardial infarction or heart attack on April 8, 2013, which required defibrillization followed by coronary angioplasty with the stenting of two

---

[4]    Rec. Doc. 11-1 at 34.

[5]    Rec. Doc. 11-1 at 23.

[6]    Rec. Doc. 11-1 at 5.

[7]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[8]    Rec. Doc. 11-1 at 35, 55.

[9]    Rec. Doc. 11-1 at 212.

[10]    Rec. Doc. 11-1 at 211.

coronary arteries.[11]  She was diagnosed with severe coronary artery disease, and her medical history included diabetes, hypertension, and throat cancer twelve years earlier.  She followed up with Dr. Raghotham Patlola at the Cardiovascular Institute of the South on April 23, 2013, May 7, 2013, May 27, 2013, and May 29, 2013.[12]  On May 29, she was "doing well."  On May 30, 2013, she underwent another heart catheterization procedure.[13]  She continued to treat with Dr. Patlola on June 14, 2013, September 13, 2013, March 12, 2014, and September 18, 2014.[14]  At the last visit, it was noted that Ms. Dogua had no insurance and would be referred to the cardiac clinic at University Hospitals and Clinics ("UHC").

Ms. Dogua was seen in the Cardiology Clinic at UHC on April 28, 2015,[15] July 27, 2015,[16] and again on December 28, 2015.[17]  At the July appointment, she complained of right lateral thigh pain that started after heart catheterization. However, a musculoskeletal examination showed normal strength and no tenderness.  In December, it was noted that she was continuing to do well, and she

---

[11]    Rec. Doc. 11-1 at 293-298, 309-310, 313-315.

[12]    Rec. Doc. 11-1 at 285-292.

[13]    Rec. Doc. 11-1 at 305-306.

[14]    Rec. Doc. 11-1 at 277-284.

[15]    Rec. Doc. 11-1 at 319-321.

[16]    Rec. Doc. 11-1 at 370-374.

[17]    Rec. Doc. 11-1 at 322-324.

denied chest pain, shortness of breath, palpitations, nausea, fatigue, activity limitations, or any other symptoms.

On August 13, 2015, Ms. Dogua was seen by nurse practitioner Tina Boudreaux in the Internal Medicine Clinic at UHC.[18]  Ms. Boudreaux appears to have been Ms. Dogua's primary care provider from that date forward.  Ms. Dogua complained of low back pain and right leg pain and claimed to have nerve damage from a prior heart catheterization.  It was reported that she had tried amitriptyline for two years without relief; therefore, Gabapentin was substituted.

Ms. Dogua again complained of low back pain, right leg pain, and arthritis in both feet when she returned to the Internal Medicine Clinic on November 19, 2015.[19]

When she was seen at UHC's Cardiology Clinic on April 25, 2016,[20] Ms. Dogua reported occasional chest discomfort at rest that lasted a few seconds.  She denied exertional chest pain or shortness of breath.  It was noted that "she is active on a daily basis and cleans her home, grocery shops, [and] walks frequently without any symptoms of interruption."  She also denied palpitations, syncope, orthopnea, edema, dizziness, nausea, weight loss or gain, or other problems.

---

[18]     Rec. Doc. 11-1 at 351-353.

[19]     Rec. Doc. 11-1 at 353-355.

[20]     Rec. Doc. 11-1 at 324-326.

At the Internal Medicine Clinic on May 19, 2016,[21] Ms. Dogua complained of low back pain and right leg pain but she had a normal range of motion.

When Ms. Dogua returned to the Cardiology Clinic on August 24, 2016,[22] she reported no chest pain, shortness of breath, palpitations, edema, orthopnea, or activity limitations although she did complain about arthritis pain in her ankles. It was noted that she could walk at least four blocks and at least two flights of stairs without shortness of breath or chest pain.

On November 18, 2016, Ms. Dogua was seen in the Internal Medicine Clinic.[23] She reported that she had been having left hip pain for two months, which worsened when she walked up steps and sometimes radiated into her left buttock. She was prescribed Naproxen for pain and Robaxin for muscle spasms.

Ms. Dogua returned to the Internal Medicine Clinic on May 19, 2017,[24] requesting a change in medication for muscle spasms. Tizanidine was prescribed.

On February 22, 2017,[25] Ms. Dogua was seen in the Cardiology Clinic and reported feeling well. She denied chest pain, shortness of breath, edema,

---

[21]     Rec. Doc. 11-1 at 355-357.

[22]     Rec. Doc. 11-1 at 327-328.

[23]     Rec. Doc. 11-1 at 357-360.

[24]     Rec. Doc. 11-1 at 360-363.

[25]     Rec. Doc. 11-1 at 329-331.

palpitations, and activity limitations. She was trying to stop smoking. When she returned to the Cardiology Clinic on August 16, 2017,[26] she was again feeling well. She denied chest pain, shortness of breath, edema, palpitations, claudication, or activity limitations. She was still trying to stop smoking. It was noted that she had normal range of motion and normal strength.

Ms. Dogua returned to the Internal Medicine Clinic on December 15, 2017.[27] She complained of worsening low back pain with radiculopathy into both posterior thighs. Lumbar x-rays showed mild multilevel disc space narrowing, greatest at L5-S1 and lower lumbar facet hypertrophy. She was to continue her medications.

An MRI of Ms. Dogua's lumbar spine, obtained on January 3, 2018,[28] showed severe bilateral facet arthropathy at L4-5 with minor diffuse bulging of annulus fibrosis but without spinal stenosis. It also showed that L5-S1 was transitionalized with bilateral facet arthropathy but no spinal stenosis.

On February 15, 2018, Nurse Boudreaux completed a medical source statement, opining that Ms. Dogua was able to stand or walk for three hours and sit for four hours out of an eight-hour workday, lift or carry ten pounds frequently, and

---

[26]    Rec. Doc. 11-1 at 331-333.

[27]    Rec. Doc. 11-1 at 363-366.

[28]    Rec. Doc. 11-1 at 392, 396.

lift or carry ten pounds occasionally during a workday.  She also opined that Ms. Dogua was not capable of performing full-time work activity.

Ms. Dogua followed up in the Cardiology Clinic on February 19, 2018.[29]  She had no cardiac complaints and specifically denied exertional chest pain, shortness of breath, palpitations, orthopnea, paroxysmal nocturnal dyspnea ("PND"), peripheral edema, syncope, or any activity limitations.  However, she complained of back pain and reported that she had bulging discs in her back and was scheduled to see a neurosurgeon in the near future.[30]

On March 15, 2018, Ms. Dogua went to the emergency department at UHC complaining of chest and knee pain after a fall a few days earlier.[31]  X-rays were taken and she was given pain medication.  At a visit to the Internal Medicine Clinic on March 23, 2018,[32] Ms. Dogua reported the recent fall.  She was healing and denied being in pain.

On August 20, 2018, Ms. Dogua returned to the Cardiology Clinic,[33] reporting intermittent left-sided chest pain but denying shortness of breath.  She also denied

---

[29]    Rec. Doc. 11-1 at 333-336.

[30]    No records documenting treatment by a neurosurgeon were located in the record.

[31]    Rec. Doc. 11-1 at 521-525.

[32]    Rec. Doc. 11-1 at 367-370.

[33]    Rec. Doc. 11-1 at 336-338.

palpitations, orthopnea, PND, peripheral edema, or syncope. She reported that her activity was limited due to chronic back pain. She had normal range of motion and normal strength in her musculoskeletal system.

Ms. Dogua was seen at the Internal Medicine Clinic on September 24, 2018.[34] She had a normal range of motion and was to continue prescribed medications for low back pain, neuropathy, radiculopathy, and sciatica.

On October 9, 2018, Ms. Dogua was evaluated by clinical psychologist Sandra B. Durdin, Ph.D.[35] Dr. Durbin opined that Ms. Dogua had no mental disorder that would preclude her ability to work.

On October 13, 2018, Ms. Dogua was examined by Allison Sidor, DO, at the request of Disability Determination Services.[36] She reported having had a heart attack on April 8, 2013, that required defibrillation and cardiac stenting. She also complained of low back pain that had started more than ten years earlier and worsened after the heart attack. She reported that her low back pain was on both sides and radiated into her buttocks and down the back of her legs. She described it as stabbing pain with tingling in both lower legs as well as constant numbness on the right lateral thigh. She was taking Ibuprofen 800 mg, which reportedly did not

---

[34]    Rec. Doc. 11-1 at 550-555.

[35]    Rec. Doc. 11-1 at 399-401.

[36]    Rec. Doc. 11-1 at 404-407.

help the pain.  She was also taking Gabapentin 600 mg, which she reported helping somewhat.  She reported that she had not done physical therapy for her back or received surgery, injections, or procedures to help her back condition.  She also reported a history of throat cancer, which was in remission.

Ms. Dogua reported that she could sit for about twenty minutes and stand for about thirty minutes.  She reported that she could feed herself, dress herself, drive a car for thirty minutes, go shopping, cook, and wash dishes.  She stated that she could sweep, mop, and vacuum with frequent breaks.  She did not use a cane or walker.

Dr. Sidor observed that Ms. Dogua had an antalgic gait, was able to rise from a sitting position without assistance, could stand on tiptoes and heels, had no problem with tandem walking, and could bend and squat without difficulty although she needed the use of a stationary object to help her stand up after squatting.  She had normal tone and strength bilaterally except for reduced strength in right hip flexion.  She had no abnormal reflexes, but she had diminished sensation to light touch over her right lateral thigh as compared to her left.  Dr. Sidor diagnosed low back pain and opined that Ms. Dogua was able to sit, walk, and stand for a full workday and was able to lift and carry objects weighing up to twenty pounds.

At the Cardiology Clinic on November 28, 2018,[37] Ms. Dogua denied chest pain and shortness of breath although a recent stress test was mildly abnormal. She also reported that her activity level was limited due to arthritis in her back.

On November 30, 2018, Ms. Dogua went to UHC's emergency room with an acute exacerbation of chronic low back pain.[38] She had a normal range of motion, normal alignment, and diffuse mild tenderness in the lumbar region. Her pulses, sensation, and strength were normal. Straight leg raise tests were negative. She was given prescriptions for Baclofen and Mobic as well as exercises to do at home. She was advised to follow up with her primary care physician.

Ms. Dogua was seen at the Internal Medicine Clinic on April 5, 2019 for an upper respiratory infection.[39] She also requested pain management for chronic back pain and was given a handout on that subject. She had a normal range of motion and was to continue her medication.

Ms. Dogua was again seen in the Cardiology Clinic on May 29, 2019.[40] She had no cardiac complaints and reported that she was able to do household chores without any issues. She had no complaints of chest pain, shortness of breath,

---

[37]    Rec. Doc. 11-1 at 528-531.

[38]    Rec. Doc. 11-1 at 516-520.

[39]    Rec. Doc. 11-1 at 556-561.

[40]    Rec. Doc. 11-1 at 531-535.

palpitations, orthopnea, PND, peripheral edema, or syncope. She had a normal range of motion and normal strength. She was continuing to smoke and was not interested in quitting.

On August 5, 2019, Ms. Dogua was again seen in the Internal Medicine Clinic complaining about back and buttocks pain.[41] She had a normal range of motion. She reported that she was unable to afford physical therapy and had been denied Social Security benefits. She was to continue taking her prescribed medications.

When Ms. Dogua saw Dr. Farha Khan for a wellness visit at UHC on November 9, 2019,[42] she reported that she had fallen that morning and twisted her left ankle. There is nothing in the treatment note indicating that Ms. Dogua complained of back pain or that she was being treated for chronic back pain.

Ms. Dogua returned to the Cardiology Clinic on December 10, 2019.[43] Once again, she had no complaints of chest pain, shortness of breath, palpitations, orthopnea, PND, peripheral edema, or syncope. She had a full range of motion in her spine and in all extremities without limitation or discomfort.

---

[41]     Rec. Doc. 11-1 at 561-566.

[42]     Rec. Doc. 11-1 at 568-572.

[43]     Rec. Doc. 11-1 at 535-539.

On February 17, 2020, Nurse Boudreaux completed another medical source statement.[44]  This time, she opined that Ms. Dogua could stand or walk for six hours out of an eight-hour workday, sit for six hours of a workday, lift or carry ten pounds frequently, and lift or carry ten pounds occasionally.  She opined that Ms. Dogua's spondylosis required that she periodically elevate one or both of her legs during the course of a workday, such as on a footstool.  In her opinion, Ms. Dogua was capable of performing fulltime work activity, and she expressly opined that the limitations she described were applicable on and before December 31, 2018.

At her cardiac office visit on May 29, 2019,[45] Ms. Dogua had no cardiac complaints.  In particular, she had no complaints of shortness of breath or chest pain. She was counseled on the importance of diet and exercise and indicated that she was not interested in stopping smoking.  Her medications were continued.

On July 13, 2020, Ms. Dogua testified at a hearing.  She stated that she had worked for twelve years as a cook's helper, making seafood stuffed pistolettes in an industrial kitchen, which required her to lift heavy pots while cooking and to load boxes of pistolettes into trucks for shipment to retail vendors.  While at work, she had a massive heart attack that required the surgical insertion of stents in her heart. She claimed that she never returned to work after the heart attack due to shortness

---

[44]     Rec. Doc. 11-1 at 590-592.

[45]     Rec. Doc. 11-1 at 458.

of breath and an inability to lift heavy objects. She also testified that she had a bulging disc and arthritis in her back along with a sciatic nerve problem, all of which allegedly caused back pain and precluded her from walking more than ten minutes without stopping to rest. She stated that she drove very little, shopped very little, and needed her husband to help with chores like vacuuming, mopping, and grocery shopping. She stated that sometimes her right leg gave out and she fell. Ms. Dogua testified that she elevated her legs twice a day for thirty minutes each time, which helped with her back pain. Her doctor had not recommend that she elevate her legs; she began doing it herself, found that it helped, and then told her doctor about it. Ms. Dogua stated that she had trouble sleeping because back and leg pain made it difficult to find a comfortable position. She stated that she could walk about a block, and she testified that the heaviest thing she could lift was a gallon of milk.

Ms. Dogua now seeks reversal of the Commissioner's adverse ruling.

## Analysis

**A.    Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[46] "Substantial evidence

---

[46]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[47]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[48]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[49]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[50]  Conflicts in the evidence[51] and credibility assessments[52] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the court in determining whether substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3)

---

[47]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[48]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[49]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[50]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[51]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[52]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[53]

## B.    <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[54]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[55]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[56]

---

[53]    *Wren v. Sullivan*, 925 F.2d at 126.

[54]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019).

[55]    42 U.S.C. § 1382c(a)(3)(A).

[56]    42 U.S.C. § 1382c(a)(3)(B).

## C.    <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[57]

Before going from step three to step four, the claimant's residual functional capacity[58] is evaluated, by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[59]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[60]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[61]  This burden may be

---

[57]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[58]    20 C.F.R. § 404.1520(a)(4).

[59]    20 C.F.R. § 404.1545(a)(1).

[60]    20 C.F.R. § 404.1520(e).

[61]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[62]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[63]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[64]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that Ms. Dogua has not engaged in substantial gainful activity since her alleged disability onset date.  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Ms. Dogua has the following severe impairments:  status-post myocardial infarction, coronary artery disease status-post stenting, stenosis of the carotid arteries, degenerative disc disease, and diabetes mellitus.  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Ms. Dogua has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  Ms. Dogua did not challenge this finding.

---

[62]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[63]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[64]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

The ALJ found that Ms. Dogua has the residual functional capacity to perform light work; can lift or carry, push, or pull twenty pounds occasionally and ten pounds frequently; can sit for six hours and stand or walk for six hours out of an eight-hour workday; and can occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant disputed this finding.

At step four, the ALJ found that Ms. Dogua is not capable of performing any past relevant work. Ms. Dogua did not dispute this finding.

At step five, the ALJ found that Ms. Dogua was not disabled from her alleged disability onset date through the date last insured because there are jobs in the national economy that he can perform. The claimant disputed this finding.

## E.    **The Allegations of Error**

Ms. Dogua contends that the ALJ erred (1) in failing to find that she cannot perform the lifting required for light work; and (2) failed to find her pain disabling.

## F.    **Is the ALJ's Residual Functional Capacity Finding Erroneous?**

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[65]    The ALJ is responsible for determining a claimant's residual functional capacity.[66] In making a finding in that

---

[65]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[66]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[67]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[68] In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[69]

In this case, the ALJ found that Ms. Dogua has the residual functional capacity to perform light work.  More specifically, the ALJ found that Ms. Dogua meets the criteria for performing light work because she can lift or carry, push, or pull twenty pounds occasionally and ten pounds frequently.  Ms. Dogua argued, however, that her back condition prevents her from being able to lift more than ten pounds.  The problem with this argument is that Ms. Dogua's treating physicians never restricted

---

[67]    *Martinez v. Chater*, 64 F.3d at 176.

[68]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

[69]    *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

her lifting, a doctor who examined her and a doctor who reviewed the evidence found that she could do the lifting required of light work, and Ms. Dogua's primary care provider issued conflicting opinions regarding her functionality. Therefore, to adopt the claimant's position, the Commissioner would have to discard medical opinions and rely solely on Ms. Dogua's own subjective perception of her lifting capability.

Ms. Dogua seems to suggest that the findings revealed by an MRI of January 2018 are sufficient to support a conclusion that she cannot ever lift more than ten pounds. But merely having symptoms or a diagnosis is not sufficient to establish that an impairment is severe,[70] to establish that an impairment meets or equals a listing,[71] or to establish that an impairment is disabling.[72] In order for a person to be found to be disabled, his medical condition must result in functional impairments that prevent him from working.[73]

In this case, Ms. Dogua cannot point to any medical opinions establishing that her medical conditions impair her functionality to a degree that any such conclusion

---

[70]    See, e.g., *White v. Saul*, No. 5-18-CV-00805-XR-RBF, 2019 WL 2642426, at *5 (W.D. Tex. June 26, 2019), report and recommendation adopted, 2019 WL 3816288 (W.D. Tex. July 18, 2019).

[71]    20 C.F.R. § 404.1525(d).

[72]    See *Johnson v. Sullivan*, 894 F.2d 683, 685 (5th Cir. 1990). See, also, *Hames v. Heckler*, 707 F.2d at 165.

[73]    *Hames v. Heckler*, 707 F.2d at 165 (the claimant "must show that she was so functionally impaired by her [impairment] that she was precluded from engaging in any substantial gainful activity.").

can be reached. There is nothing in the record correlating the January 2018 MRI results to any particular lifting capacity or other functional restriction. In October 2018, Dr. Sidor evaluated Ms. Dogua's low back pain and opined that she could lift and carry objects weighing up to twenty pounds. When the agency evaluator, Dr. James Metcalf, reviewed the evidence in November 2018, he found that Ms. Dogua could lift and carry twenty pounds occasionally. Ms. Dogua suggests that neither Dr. Sidor nor Dr. Metcalf reviewed the January 2018 MRI. While their reports do not specifically mention the MRI, both reports postdated the MRI, and Dr. Metcalf reviewed records from UHC. Ms. Dogua suggests that the ALJ should have given more weight to Nurse Boudreaux's opinion that Ms. Dogua cannot lift more than ten pounds. But Nurse Boudreaux's opinions regarding Ms. Dogua's lifting ability are not supported by objective findings in her treatment notes. Nurse Boudreaux consistently stated that Ms. Dogua had a normal range of motion and failed to note any objective findings revealed by a physical examination that would support a conclusion that Ms. Dogua was unable to lift more than ten pounds. Accordingly, there is substantial evidence in the record supporting the ALJ's conclusion that Ms. Dogua can perform light work, including the lifting and carrying criteria for light work.

Ms. Dogua argued that the ALJ should have done a better job of articulating the evidentiary basis for his conclusion that Ms. Dogua can perform the lifting

required by light work.  But the ALJ summarized the evidence, explained how persuasive he found the medical opinions, and reached conclusions based on substantive evidence in the record.  Accordingly, this Court finds that he did not apply improper legal standards.  This Court therefore finds that the ALJ did not err in finding that Ms. Dogua has the residual functional capacity to perform light work.

## G.    Did the ALJ Err in Failing to Find the Claimant's Pain Disabling?

Ms. Dogua argued that the ALJ's finding her pain complaints not credible was an insufficient basis for denying her disability claim.  But the issue is not whether the ALJ believed Ms. Dogua but whether there were objective signs and medical opinions corroborating her pain complaints.   Pain can constitute a disabling impairment,[74] but pain is disabling only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment.[75]   Mild or moderate pain is not disabling.  Furthermore, subjective complaints, such as complaints of pain, must be corroborated by objective medical evidence.[76]  "The mere existence of pain does not

---

[74]     *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).

[75]     *Falco v. Shalala,* 27 F.3d at 163; *Selders v. Sullivan*, 914 F.2d 614, 618-19 (5th Cir. 1990).

[76]     *Chambliss v. Massanari*, 269 F.3d at 522.

automatically create grounds for disability, and subjective evidence of pain will not take precedence over conflicting medical evidence."[77]

The evidence in the record does not establish that Ms. Dogua has disabling pain. To the contrary, Ms. Dogua did not complain to her health care providers about back pain that was unremitting and unresponsive to treatment. Nurse Boudreaux began seeing her in 2015, but never referred her to a specialist. The only objective testing performed by Nurse Boudreaux was an evaluation of her range of motion, which was consistently within normal limits. Nurse Boudreaux prescribed muscle relaxers and mild painkillers, but did not prescribe opioids and only once changed a prescription due to alleged ineffectiveness. The treatment note from Ms. Dogua's wellness visit with Dr. Khan in November 2019 does not mention back pain at all. Thus, there is substantial evidence in the record to conclude that Ms. Dogua did not suffer from disabling pain.

Ms. Dogua argued, however, that the ALJ's decision would have been different if he had properly considered her January 2018 MRI. But the ALJ reviewed the MRI results and summarized them in his ruling. Based at least in part on the MRI, the ALJ found that Ms. Dogua's degenerative disc disease is severe. But the mere existence of an illness, condition, or impairment does not by itself establish

---

[77]    *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).

disability; instead, there must be evidence that the claimant's functionality is negatively impacted.[78] For a person to be found disabled, his medical condition must result in functional impairments that prevent him from working.[79] Thus, the MRI results alone do not establish that Ms. Dogua cannot work.

The ALJ also noted that Ms. Dogua had never had physical therapy, surgery, injections, or other procedures to treat her alleged back pain. In one treatment note, Ms. Dogua reported that she had an appointment with a neurosurgeon, but the record contains no evidence that she kept that appointment or treated with any neurologist, orthopedist, or other specialist for her alleged back pain. In another treatment note, Ms. Dogua requested a pain management consultation. But there is no evidence that her primary care provider ever referred her to a pain management specialist or that she ever saw one. She was treated very conservatively, which fails to support her complaint of disabling pain. A claimant's lack of need for strong medication and a claimant's failure to seek treatment are relevant factors to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount a claimant's complaints of disabling pain or other

---

[78]      See *Johnson v. Sullivan*, 894 F.2d at 685. See, also, *Hames v. Heckler*, 707 F.2d at 165.

[79]      *Hames v. Heckler*, 707 F.2d at 165 (the claimant "must show that she was so functionally impaired by her [impairment] that she was precluded from engaging in any substantial gainful activity.").

limitations.[80]   In this case, the ALJ did not err in discounting Ms. Dogua's pain complaints on the basis of the treatment she received for her back condition.  In sum, Ms. Dogua failed to prove that her back pain is disabling.

## Conclusion and Recommendation

The claimant did not establish that the ALJ used improper legal standards in evaluating the evidence or that the ALJ's decision was not supported by substantial evidence.   Accordingly,  for  the  reasons  fully  discussed  above,  this  Court recommends  that  the  Commissioner's  decision  should  be  AFFIRMED  and  this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed  legal  conclusions  reflected  in  the  report  and  recommendation  within

---

[80]     *Austin v. Apfel*, 205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999) (citing *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991)). See, also, *Clayborne v. Astrue*, 260 Fed. App'x 735, 737 (5th Cir. 2008); *Doss v. Barnhart*, 137 Fed. App'x 689, 690 (5th Cir. 2005); *Villa v. Sullivan*, 895 F.2d at 1024.

fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[81]

Signed at Lafayette, Louisiana, this 25th day of January 2022.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[81]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

26